***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. At all times relevant to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act. *Page 2 
2. At all times relevant to this claim, an employment relationship existed between Plaintiff and Defendant-Employer.
3. On March 24, 2005, Specialty Risk Services was the workers' compensation carrier for Defendant-Employer.
4. The parties stipulated that Plaintiff's average weekly wage was $769.00, yielding a compensation rate of $512.66.
 *********** ISSUES
1. Did Plaintiff sustain an injury by accident on March 24, 2005, which resulted in a rotator cuff tear to his right shoulder?
2. What benefits, if any, is Plaintiff entitled to recover pursuant to the North Carolina Workers' Compensation Act?
3. Is Plaintiff's attorney entitled to attorney fees for litigating the issues set forth pursuant to N.C. Gen. Stat. § 97-88.1?
 ***********
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of hearing before the Deputy Commissioner, Plaintiff was 53 years of age, having a date of birth of July 3, 1952. Plaintiff has worked for Defendant-Employer's rock quarry business for over twenty years. Defendant-Employer's rock quarry business involves drilling, blasting, crushing and processing stone to sell for concrete and asphalt. Plaintiff is employed with Defendant-Employer as a lead person, which is a management position that Plaintiff has held for approximately ten years. *Page 3 
2. The position as a lead person requires Plaintiff to supervise thirteen employees and oversee all quarry operations, including maintenance, drilling and blasting operations. Additionally, Plaintiff's position requires him to use shovels, coffin hoists and chains; operate all quarry equipment; drive loaders and perform any other duties that need to be done at the quarry. Plaintiff testified that his job is eighty percent labor and twenty percent management.
3. On March 24, 2005, Defendant-Employer's Kings Mountain Quarry was having a problem with the engine door of a Volvo rock loader used in the quarry operations. The door to the engine compartment was bent and would not properly close. The door is located on the front, right side of the loader. A metal platform measuring two feet by two feet is located below and to the right of the engine compartment door. The platform is three feet off the ground.
4. On March 24, 2005, Plaintiff sustained an injury to his right shoulder while repairing the bent engine compartment door on the Volvo loader. On this date, Steve Hullender, a foreman, and Randy Cogdill, a welder, determined that the loader door needed repair to enable it to close properly. Mr. Hullender, Mr. Cogdill and Plaintiff began working to straighten the door. The Plant Manager, Don Champion, was present at the beginning of the repair, but did not stay until the work was completed.
5. The engine compartment loader door was straightened using a thirty-pound coffin hoist (also referred to as a "comealong"), a chain and a four by four board. Mr. Cogdell testified that he had never seen the door repaired in this manner before and he had never seen Plaintiff perform repair work on an engine compartment loader door before. Mr. Hullender climbed on top of the loader tire and braced the four by four board behind the engine compartment loader door to keep it in a fixed position. Mr. Cogdill brought the chain and coffin hoist to the loader. Plaintiff stood on the two feet by two feet platform and connected the coffin hoist to a hook *Page 4 
inside the engine compartment of the Volvo loader. Plaintiff wrapped the chain, which he connected to the coffin hoist, around the door and hooked the chain to the door. Plaintiff then placed his right hand on the handle of the coffin hoist, which was about chest high, and began to ratchet or "jack" the coffin hoist to tighten the chain and exert pressure to straighten the bent door. Due to the tight space, Plaintiff leaned back against the battery box to ratchet or "jack the comealong."
6. Plaintiff's body was in an awkward position while performing the repair work. He was working in a confined space, on the two feet by two feet platform, which was three feet off the ground and he had to lean at an angle against the battery box and reach chest-high to ratchet the coffin hoist. Due to his body weight of approximately 242 pounds, the size and position of the platform and his fear of falling, Plaintiff could not face the engine door "straight on." He worked from the platform for as much as 45 minutes without a break and testified that he became tired. Plaintiff had never repaired an engine door before and had never used a coffin hoist in the manner and under the circumstances in which he worked on March 24, 2005.
7. When the straightening of the door was completed, Plaintiff proceeded to remove the coffin hoist from the engine compartment hook. He testified that he "tripped the lever to release the comealong and jack it back" and unhooked the chain from the door. Plaintiff then placed his left hand on the engine door to steady himself to keep from falling and while leaning at an angle, he used his right hand to grab the handle of the coffin hoist and reach in an upward motion to "snatch" and clear the coffin hoist from the engine compartment hook. Plaintiff testified that he immediately felt a "loud pop" in his right arm and sharp pain through his upper shoulder causing him to then grab the coffin hoist with his left hand because he did not want it to fall into the engine compartment. Plaintiff testified that he would not have tried to move the *Page 5 
coffin hoist from the hook with one hand had he not been working in such a confined space up off the ground. He usually and customarily would have used two hands to remove the hoist off the hook to give him more leverage.
8. Plaintiff and his co-workers, William Gray and Kenny Caveny, testified that it is harder to use a coffin hoist while working up off the ground, or in a close space. Mr. Gray also testified it would be more difficult to use a coffin hoist when facing it at any angle. Mr. Champion, who disputes that Plaintiff worked in an awkward position, left the scene of the repair 15-20 minutes before the injury occurred and admitted that he does not know what happened after he left.
9. Mr. Champion agreed that job descriptions are expected to list the normal and usual activities, tasks and duties associated with a particular job and to summarize the common and routine tasks of a job. He could not identify any specific language in Plaintiff's job description that listed repairs as usual activities, tasks and duties. Mr. Champion testified, however, that the phrase in Plaintiff's job description, "[t]o perform other duties required by management," made the repair work to the loader door routine. No witness, including Mr. Champion, could recall a prior situation where Plaintiff repaired a loader door or used a coffin hoist in the manner and under the circumstances in which he worked on March 24, 2005. Plaintiff's co-workers testified that there are "no written instructions or formal job procedures" for the type of repair Plaintiff was doing when injured and no manual or training or standard operating procedure for this type of repair.
10. Plaintiff testified that Defendant-Employer's mechanics and welders would normally perform repair work on the loaders unless it was minor maintenance work. Mr. Champion recalled instances where he had employed outside contractors or vendors to repair the *Page 6 
company's loaders, including making structural repairs. Mr. Champion also admitted that performing structural repairs to the loaders was part of the job descriptions for the mechanics and welders. Mr. Cogdell, a welder and Mr. Caveny, a mechanic for Defendant-Employer testified that repair work on the company's vehicles was part of their job descriptions.
11. Immediately following his injury, Plaintiff informed Mr. Champion about his injury and asked for advice on what he should do. Plaintiff then drove a pick-up truck to report his injury to Office Manager Phil Wright who was responsible for collecting and filing accident and injury reports for the quarry. Plaintiff testified that he had so much pain and weakness in his right shoulder that he had to start the truck and put it in gear using his left hand.
12. The parties stipulated into evidence two Form 19s prepared by Defendants, which show that the injury to Plaintiff's right shoulder was reported on March 24, 2005. Other witnesses also testified that Plaintiff complained of injuring himself on the job that day. In addition, Mr. Champion testified that he knew Plaintiff had been injured on the job.
13. Based on the greater weight of the evidence, the coffin hoist was used on a regular basis at the Kings Mountain Quarry and Plaintiff had used the coffin hoist on many occasions during his career with Defendant-Employer. However, Plaintiff had never used a coffin hoist (comealong) in the manner and under the conditions that existed at the time he was injured. The type of work he was performing at the time of injury was not usual or customary or a part of his regular work routine. The Full Commission finds that Plaintiff sustained an injury by accident on March 24, 2005. All of the circumstances surrounding Plaintiff's work in straightening the bent loader door, as described above, constituted unexpected and unusual work conditions. Moreover, Plaintiff interrupted his normal work routine when he reached upward and snatched the coffin hoist off the hook with one hand rather than two hands while his body was in a *Page 7 
position of "mechanical disadvantage" due to the confined space in which he was working while three feet off the ground, and having to lean at an angle, reach chest-high and lift a thirty-pound coffin hoist. Plaintiff had already used his right arm to ratchet the coffin hoist during at least part of the forty-five minute period the door was being repaired and he testified that he was tired. Plaintiff's working conditions, combined with his fear of falling, were not usual and customary and the injury to his shoulder on March 24, 2005 constituted an injury by accident.
14. Plaintiff reported to work the next day even though he continued to experience pain and weakness in his right shoulder.
15. On Saturday, March 26, 2005, Plaintiff was working in his yard at home. Plaintiff testified he picked up a tree limb three inches in diameter and felt excruciating pain in his right shoulder.
16. Dr. Jeffrey Smith saw Plaintiff on Monday, March 28, 2005. The purpose of this doctor's visit was to follow up on Plaintiff's diabetes. Plaintiff gave a history to Dr. Smith of picking up a heavy item at work and feeling a "pop" in his right shoulder and immediately having some pain, stiffness and decreased range of motion for a while. Plaintiff also reported to Dr. Smith that over the weekend he was working in his yard and felt another pop in the same shoulder when he moved a tree limb. Dr. Smith's note indicated that because of the pain, stiffness and decreased range of motion, Plaintiff was unable to even comb his hair using his right hand. Dr. Smith suspected a rotator cuff injury and referred Plaintiff to Dr. William Jarman, an orthopedist, for his right shoulder.
17. On April 5, 2005, Plaintiff underwent an MRI that confirmed a rotator cuff tear in the right shoulder. On June 22, 2005, almost three months after the injury, and after various conservative measures failed to improve the Plaintiff's condition, Dr. Erik Johnson, another *Page 8 
orthopedist in Dr. Jarman's office, performed arthroscopic rotator cuff repair surgery as well as a distal clavicle excision and subacromial decompression and wrote Plaintiff out of work. Plaintiff had not previously been written out of work or given any work restrictions so he continued to work until his surgery. Plaintiff testified that he went ahead with the surgery because Dr. Johnson had warned him that the longer the time between a massive rotator cuff tear and an attempt to repair it surgically, the harder and more unpredictable the results. Dr. Johnson opined that if Plaintiff waited longer than four to six months after the injury to have surgery to repair the tear, Plaintiff might compromise the ultimate long-term function of his shoulder and possibly reduce the chances of pain relief and improved shoulder strength and could require a more extensive surgical repair
18. Dr. Smith and Dr. Johnson causally related Plaintiff's right rotator cuff condition to his injury that occurred at work on March 24, 2005. Dr. Johnson also testified that, as an orthopedic surgeon, he has received training in, and is knowledgeable about biomechanics. Dr. Johnson opined that lifting the thirty-pound coffin hoist would be sufficiently heavy to tear the rotator cuff. Dr. Johnson also opined that lifting the coffin hoist off the hook one hand, rather than two, while working in a confined space with his body in an awkward position would increase the likelihood of Plaintiff suffering an injury to the shoulder. Dr. Johnson further opined that the angle and other working conditions that Plaintiff faced in lifting and snatching the hoist to unhook it from the catch, put his right arm at a "mechanical disadvantage" causing tremendous amounts of stress on the rotator cuff.
19. Both Dr. Smith and Dr. Johnson opined that the yard work Plaintiff attempted on Saturday, March 26, 2005, was not likely the cause of Plaintiff's massive rotator cuff injury. However, Dr. Smith felt that the yard work possibly could have further aggravated the shoulder *Page 9 
injury. Based on the greater weight of the evidence the Full Commission finds that Plaintiff's right rotator cuff injury, which required surgery, was causally related to his injury by accident arising out of and in the course of his employment on March 24, 2005 and not the yard work.
20. Although Plaintiff is still employed by Defendant-Employer, he had not been allowed to return to work as of the date of the hearing before the Deputy Commissioner due to his physician-imposed physical restrictions, which prevented him from performing all of his pre-injury job duties. Defendant-Employer did not attempt to provide Plaintiff with work within his restrictions.
21. Dr. Johnson is of the opinion that Plaintiff may have reached maximum medical improvement, but he also believes Plaintiff would benefit from additional physical therapy in an attempt to improve the functioning of his arm. Dr. Johnson opined that it is unlikely Plaintiff will ever completely regain the total strength he has lost in his right extremity. Dr. Johnson has given Plaintiff restrictions that limit heavy lifting, pushing, and pulling of the right upper extremity to 10 pounds and estimates that Plaintiff has sustained a 21% permanent partial impairment to the upper right extremity. Dr. Johnson did not rule out further improvement in Plaintiff's strength.
22. Defendants provided short-term disability payments to Plaintiff for 26 weeks following his surgery. Plaintiff's health insurance paid for his medical treatment related to his shoulder injury, and Plaintiff incurred out-of-pocket costs associated with his health insurance, including co-payments and prescription drug expenses. At the time of hearing before the Deputy Commissioner, these costs were itemized and stipulated.
23. Plaintiff has had a number of relatively minor accidents and injuries over the years in the quarry, but he never missed work even when hurt. With the exception of a bruise to *Page 10 
his right shoulder from carrying steel years earlier and a little bursitis in both shoulders, Plaintiff has not had a problem or injury to his right shoulder.
24. Co-workers Mr. Gray and Mr. Champion called Plaintiff a "company man" who liked his job and employer, and testified he was "loyal" to Defendant-Employer. Mr. Champion rated Plaintiff's job performance as good to above average. Mr. Champion also testified that Plaintiff had a reputation for being truthful. Mike Coleman, a co-worker and Plaintiff's brother-in-law, agreed with the above testimony.
25. Mr. Champion and Kevin Barnes, the Safety Manager, did not dispute that Plaintiff had told "various people at the Kings Mountain facility he had injured his shoulder while at work." Mr. Champion admitted in his deposition testimony that Plaintiff had reported his injury on the job to him personally and that he saw him on a daily basis after the accident at work and they discussed how his shoulder was doing.
26. Although he was Plant Manager and was aware of Plaintiff's injury, Mr. Champion failed to conduct any investigation regarding Plaintiff's injury. At his deposition, Mr. Champion admitted that he should have followed up when he realized Plaintiff's injury was going to involve more than one visit to the doctor.
27. Plaintiff filed a Form 18 notice of injury on July 15, 2005. Plaintiff's failure to give written notice of his injury within thirty days was excusable, as Defendants had actual notice on the day of injury. Defendants were not prejudiced by the lack of written notice of injury within thirty days.
28. Defendants did not file a Form 61 denial of the claim until February 22, 2006, which constituted an unreasonable delay. In its discretion, the Full Commission finds that Defendants are not entitled to a credit for the short-term disability payments made to Plaintiff *Page 11 
through Defendant-Employer's disability plan. Plaintiff would have collected the majority, if not all, of these disability payments during the 32 weeks of delay in Defendants' denial of his claim.
29. Defendants have not defended this action without good cause, as there existed a reasonable issue in controversy of whether Plaintiff sustained an accident as defined under the Workers' Compensation Act. Accordingly, the Full Commission finds that Defendants have not engaged in stubborn and unfounded litigiousness.
30. The parties stipulated that Plaintiff's average weekly wage was $769.00, yielding a compensation rate of $512.66.
31. The medical treatment Plaintiff received for his compensable injury by accident was reasonably required to effect a cure, provide relief, or to lessen his disability.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. Plaintiff has proven by the greater weight of the evidence that he sustained a compensable injury by accident to his right shoulder on March 24, 2005, arising out of and in the course of his employment with Defendant-Employer. N.C. Gen. Stat. § 97-2(6).
2. An accident is "an unlooked for and untoward event which is not expected or designed by the person who suffers the injury." Adams v.Burlington Industries, Inc., 61 N.C. App. 258, 260, 300 S.E.2d 455, 456
(1983) (citation omitted). "The elements of an `accident' are the interruption of the routine of work and the introduction thereby of unusual conditions likely to result in unexpected consequences."Id. (citation omitted). In Calderwood v. Charlotte-Mecklenburg Hosp.Authority, 135 N.C. App. 112, 115-16, 519 S.E.2d 61, 63 (1999) the North *Page 12 
Carolina Court of Appeals found that there existed undisputed evidence that the Plaintiff had never in her eleven years of work with Defendant-Employer Hospital, assisted a patient in child delivery where the Plaintiff was required to lift the leg of a 263 pound patient who experienced a total epidural block and was unable to assist in lifting her leg. The fact the Plaintiff's job responsibilities did include assisting and lifting the legs of patients who received epidurals resulting in a total block was not dispositive. The Calderwood Court determined the true question is whether the Plaintiff's regular work routine required lifting the legs of women weighing 263 pounds who had received epidurals resulting in total blocks. All of the circumstances surrounding Plaintiff's work in straightening the bent loader door, as described above, constituted unexpected and unusual work conditions which interrupted Plaintiff's regular routine. In particular, Plaintiff interrupted his normal work routine and introduced unusual conditions likely to result in unexpected consequences when he reached upward and snatched the thirty-pound coffin hoist off the hook with one hand rather than two hands while his body was in a position of "mechanical disadvantage" due to the confined space in which he was working, three feet off the ground, and having to lean at an angle and reach chest-high to lift the coffin hoist. Because Plaintiff had already used his right arm to ratchet the coffin hoist during at least part of the forty-five minute period the door was being repaired, he was already tired. The totality of the conditions under which Plaintiff worked at the time of his injury, combined with his fear of falling, were not usual or customary duties for Plaintiff whose job title as lead person did not involve repair of loader doors. The injury to Plaintiff's shoulder on March 24, 2005 constituted an injury by accident. Griggs v. Eastern OmniConstructors, 158 N.C. App. 480, 581 S.E.2d 138 (2003). *Page 13 
3. As a result of his injury, plaintiff's was disabled from June 22, 2005 through the date of the Deputy Commissioner hearing and continuing. "The burden is on the employee to show that he is unable to earn the same wages he earned before the injury, either in the same employment or in other employment. The employee may meet this burden in one of four ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury." Russell v. Lowes Product Distribution,108 N.C. App. 762,765, 425 S.E.2d 454, 457 (1993). In the instant case, as a result of Plaintiff's injuries and subsequent surgery and work restrictions, he was incapable of earning wages in any employment from June 22, 2005 through his release to return to work date. After his release to return to work, Defendant-Employer would not allow Plaintiff to return to work with restrictions and did not provide him light duty work. Plaintiff is still employed with Defendant-Employer and it would be futile for him to look for suitable employment with another employer, while he continues to heal sufficiently to be able to return to his pre-injury job.
4. The parties stipulated that Plaintiff's average weekly wage was $769.00, yielding a compensation rate of $512.66. N.C. Gen. Stat. §97-2(5).
5. Plaintiff is entitled to temporary total disability compensation from June 22, 2005, until further Order of the Commission. N.C. Gen. Stat. § 97-29. *Page 14 
6. Plaintiff is entitled to payment of medical expenses incurred or to be incurred as a result of his compensable injury for so long as such treatment may reasonably be required to effect a cure, provide relief, or lessen the period of disability. Plaintiff is entitled to reimbursement for any co-pays or out-of-pocket expenses and any liens held by his medical insurance carrier. N.C. Gen. Stat. § 97-25.
7. In its discretion the Full Commission concludes that Defendants are not entitled to a credit for short-term disability payments made to Plaintiff from Defendant-Employer's disability plan. Plaintiff would have collected the majority, if not all, of these disability payments during the thirty-two weeks that Defendants' delayed in filing a denial of his claim. N.C. Gen. Stat. § 97-42.
8. Defendants have not engaged in stubborn and unfounded litigiousness and Plaintiff is not entitled to attorney fees and costs. N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney fees hereinafter approved, Defendants shall pay to Plaintiff temporary total disability compensation at the rate of $512.66 per week from June 20, 2005, and continuing until further Order of the Commission. That portion of temporary total disability compensation that has accrued shall be paid in a lump sum.
2. Reasonable attorney fees of 25% of the compensation due Plaintiff is approved for Plaintiff's counsel, and shall be paid as follows: 25% of the lump sum due Plaintiff shall be *Page 15 
deducted and paid directly to Plaintiff's attorney; thereafter every fourth compensation check due Plaintiff shall be deducted and paid directly to Plaintiff's attorney.
3. Defendants shall pay all medical expenses incurred or to be incurred in the future by Plaintiff as a result of his injury, including reimbursement to Plaintiff for out-of-pocket expenses and any liens held by his medical insurance carrier in accordance with procedures adopted by the Commission.
4. Defendants shall pay the costs.
This the __ day of August 2007.
S/________________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/________________________ DIANNE C. SELLERS COMMISSIONER
 S/________________________ DANNY LEE McDONALD COMMISSIONER